FILED RECEIVED
ENTERED SERVED ON
COUNSEL/PARTIES OF RECORD
SEP 15 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

MARK V. DREIBELBIS,

Plaintiff,

v.

CLARK COUNTY, NEVADA, a political subdivision of the State of Nevada; and DOES 1 through 3, inclusive,

Defendants.

Case No.: 2:26-cv-02953-GMN-EJY

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

(42 U.S.C. § 1983 — Fourteenth Amendment Due Process)

**JURY TRIAL DEMANDED**

## INTRODUCTION

Plaintiff Mark V. Dreibelbis brings this action under 42 U.S.C. § 1983 for deprivations of rights secured by the Fourteenth Amendment to the United States Constitution. This complaint challenges the procedural adequacy of the ability-to-pay inquiry conducted before Plaintiff was incarcerated for civil contempt on September 16, 2024, in two child support enforcement proceedings heard simultaneously by the same Hearing Master.

Plaintiff does not challenge the validity of the underlying child support obligations or the state court's authority to enforce lawful orders. Plaintiff does not contend that Bearden v. Georgia, 461 U.S. 660 (1983), or Turner v. Rogers, 564 U.S. 431 (2011), limits courts solely to cash-on-hand analysis. Rather, Plaintiff contends that the Clark County District Attorney's Office, Family Support Division ("FSD"), maintained a recurring administrative practice and custom of supplying historical payment-compliance information and requesting standardized purge amounts in lieu of an individualized present-ability determination — and that this practice, applied at the September 16, 2024 hearing, resulted in Plaintiff's incarceration without a constitutionally adequate determination that he presently possessed, or could presently obtain, the funds necessary to purge his confinement.

Plaintiff separately alleges that this recurring administrative practice was not an isolated occurrence. These earlier events, including the January 30, 2024 and June 5, 2024 hearings, are offered as historical and pattern evidence bearing on the existence, duration, and recurrence of the

alleged administrative practice. Plaintiff does not seek damages for those events as independent claims.

Plaintiff distinguishes three categories of conduct described in this complaint: (1) the judicial acts of the Hearing Master presiding over Plaintiff's proceedings, offered as evidence of what information was before the court and what the court did with it, not as a basis for liability against any Defendant; (2) the in-court advocacy of FSD attorneys, offered as evidence of the FSD's recurring practice, but not as a basis for individual liability against any attorney for arguments made in court; and (3) the pre-hearing administrative conduct of FSD employees responsible for present-ability screening, purge calculation, and preparation of financial information supplied to the court, which is the basis for the individual-capacity claims in Count I below and, together with the pattern it forms across Plaintiff's proceedings, the basis for the municipal-liability claim in Count II.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States, specifically the Fourteenth Amendment and 42 U.S.C. § 1983.

2. Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendants are located in Clark County, Nevada, and the events giving rise to this action occurred in Clark County. The action is properly filed in this Court's unofficial Southern Division. LR IA 1-6.

3. Federal abstention doctrines do not bar this action. Plaintiff seeks compensatory and nominal damages for a completed constitutional injury arising from a discrete past custody event. Plaintiff does not seek injunctive relief, does not ask this Court to modify or reverse any state court order, and does not seek federal supervision of any ongoing family court proceeding. The custody event giving rise to this action is complete.

**PARTIES**

4. Plaintiff Mark V. Dreibelbis is an individual residing in Clark County, Nevada. At all times relevant to this action, Plaintiff was a respondent in two child support enforcement

proceedings pending in the Eighth Judicial District Court, Clark County, Nevada: Case No. 98R092097 (Dreibelbis v. Dreibelbis, arrears-only) and Case No. R-22-221265-R (Kaiser v. Dreibelbis).

5. Defendant Clark County, Nevada is a political subdivision of the State of Nevada. The Clark County District Attorney's Office, Family Support Division ("FSD") is a governmental unit of Clark County that performs child support enforcement functions, including contempt proceedings, license suspension recommendations, and other enforcement mechanisms. Clark County, not the FSD or the District Attorney's Office in its own name, is the proper defendant for the acts and omissions described herein. Wayment v. Holmes, 112 Nev. 232, 912 P.2d 816, 819 (1996) (a county department, including a district attorney's office, is not a suable entity separate from the county). Plaintiff alleges that the pre-hearing administrative conduct described in this complaint — present-ability screening, purge calculation, and preparation of financial information for court — was performed by Clark County FSD employees in the course of County administrative functions. Plaintiff is presently without information establishing the full division of responsibility between Clark County and the State of Nevada's Title IV-D program over these specific functions, and reserves the right to amend this allegation as that division of responsibility is clarified through discovery.

6. Does 1 through 3 are Clark County FSD employees, agents, or officials whose true identities are presently unknown to Plaintiff, named under fictitious designations in the caption pursuant to Fed. R. Civ. P. 10(a). Plaintiff intends to rely on Fed. R. Civ. P. 15(c)(1)(A), which requires the court to consider both federal and state relation-back standards and employ whichever is more permissive where state law supplies the applicable limitations period, Butler v. National Community Renaissance of California, 766 F.3d 1191, 1200-01 (9th Cir. 2014), together with Nevada's fictitious-defendant practice under NRCP 10(d); Nurenberger Hercules-Werke GmbH v. Virostek, 107 Nev. 873, 822 P.2d 1100 (1991), when substituting the true names of these individuals once ascertained through the early, identity-focused discovery described in Paragraph 8 below. Plaintiff does not presently know whether these functions were performed by one, two, or three separate individuals, and does not allege that they were necessarily performed by

different people. (a) Doe 1 is the FSD employee or employees responsible for performing or ensuring any pre-hearing present-ability screening — including any screening called for under Nevada's Support Enforcement Manual § 612 and 45 C.F.R. § 303.6(c)(4) — applicable to the September 16, 2024 hearing. (b) Doe 2 is the FSD employee or employees who participated in any pre-hearing administrative work leading to the combined $365 release condition — $109 in the Kaiser case and $256 in the companion case — requested by the FSD and imposed at the September 16, 2024 hearing. (c) Doe 3 is the FSD employee or employees who prepared or approved the financial and compliance information presented to the court at the September 16, 2024 hearing, including the $327.00 due / $128.00 paid / 39% compliance figures.

7. At all times relevant to this action, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

8. Plaintiff has exercised reasonable diligence in attempting to identify Does 1 through 3 prior to filing this action. On August 20, 2026, Plaintiff submitted a written public records request to the FSD seeking, among other things, records concerning present-ability screening, the basis for the September 16, 2024 purge calculation, and internal communications concerning the preparation of the financial information presented at that hearing. On August 26, 2026, the FSD denied the request in full, citing only a general assertion of confidentiality without identifying any specific statute or legal authority. On August 31, 2026, Plaintiff requested clarification of the specific legal basis for the denial and asked that any segregable, non-confidential material — including general agency policies, procedures, and purge-calculation standards — be produced notwithstanding any confidentiality applicable to individual case records. On September 9, 2026, the FSD issued a second denial, this time citing NRS 239.0105 — a statute that, by its own terms, governs the confidentiality of identifying information submitted for recreational-facility reservations and recreational or instructional program enrollment, and which has no facial application to child support or Title IV-D enforcement records. Plaintiff intends to seek early, identity-focused discovery under Fed. R. Civ. P. 26(d) promptly after this action is filed.

## FACTUAL ALLEGATIONS

### I. Background: The Two Child Support Cases and the Commission-Based Income Context

9. Plaintiff Mark V. Dreibelbis is a Nevada-licensed real estate salesperson with approximately thirty years of experience in the Las Vegas market. His income is commission-based, meaning it is received only upon the successful closing of real estate transactions and is subject to unpredictable market conditions, transaction cancellations, and the timing of escrow closings.

10. Plaintiff is subject to two child support orders enforced through the Clark County District Attorney's Office, Family Support Division. Case No. 98R092097 (Dreibelbis v. Dreibelbis) is an arrears-only case with a monthly obligation of $256.84. Case No. R-22-221265-R (Kaiser v. Dreibelbis) carries a current support obligation that has been modified multiple times during the relevant period.

11. Between 2022 and 2024, the real estate market experienced extraordinary volatility. Beginning in 2022, interest rate increases caused an industry-wide spike in transaction cancellations. A marketing communication from Noble Home Loans, a commercial mortgage lender, sent to Plaintiff on April 23, 2024 stated: 'In Today's Climate, 40% Of Deals Don't Close.' Plaintiff experienced this cancellation rate directly: between 2022 and 2023, twelve transactions in which Plaintiff served as agent and which proceeded to escrow were canceled before closing, resulting in $252,827 in commissions that were anticipated but never received. This list of canceled transactions was presented to the court on October 9, 2023 and acknowledged on the record.

12. Beginning in 2022, a factoring company called Commission Express (operating in Nevada as 'Aces NV,' a franchise of AJ Factors LLC d/b/a Commission Express) began asserting demands against Plaintiff's real estate commissions. Commission Express had advanced approximately $14,530 against two specific transactions — 5 Tatahatso Court and 56 Tatahatso Street, Henderson, Nevada — both of which were subsequently canceled before closing. Commission Express then issued default notices claiming entitlement to all future commissions across all brokerages until the balance was repaid, notwithstanding that there

was no judgment, no writ of execution, and no judicial authorization for commission interception.

13. Between February and July 2024, while Plaintiff was associated with eXp Realty, LLC, three real estate transactions closed in which Plaintiff served as the selling agent. Payment Remittance Advices issued by eXp Realty for each transaction confirm that Commission Express (identified in eXp's payment system as 'Commission Express Aces NV') received 100% of the net commission proceeds on each closing, with $0.00 remitted to Plaintiff: (a) February 28, 2024 — 2866 Loveland Drive, $5,426.00 diverted; (b) May 31, 2024 — 175 Tapatio Street, $6,267.08 diverted; (c) July 9, 2024 — 8216 Cabin Springs Avenue, $8,573.16 diverted. The July 9, 2024 remittance is particularly significant: it reflects simultaneous income withholding of $256.84 for child support (Case No. 98R092097) and $145.00 for child support (Case No. R-22-221265-R) in the same disbursement cycle in which Commission Express received $8,573.16 — demonstrating that the income withholding mechanism functioned when income existed, and that Commission Express's interception was the reason Plaintiff received nothing.

14. A fourth commission diversion is documented by an Electronic Funds Transfer dated August 3, 2023, in which Signature Real Estate Group remitted $10,020.00 directly to Commission Express from the commission on the sale of 2021 Grafton Avenue, Henderson, Nevada. The total amount diverted to Commission Express from Plaintiff's commissions across all four transactions was $30,286.24 — none of which reached Plaintiff.

15. Across all four documented transactions, commission proceeds that would otherwise have reached Plaintiff were instead remitted directly to Commission Express before becoming accessible to him. The Hearing Master presiding over Plaintiff's contempt proceedings acknowledged on September 16, 2024 that Plaintiff had presented 'a very compelling argument that they're an unsecured creditor and that they're acting as a secured creditor and they shouldn't be allowed to do that.' Regardless of the ultimate resolution of that legal question, the practical consequence is documented: Plaintiff received no proceeds from any of the four closings. As set forth in Paragraph 30 below, this inaccessibility was discussed and acknowledged at the September 16, 2024 hearing, but that acknowledgment was never

connected to a finding that Plaintiff nonetheless had the present ability to produce the release amount demanded that day.

16. In addition to the Commission Express diversion, Plaintiff's ability to obtain alternative employment was limited during the relevant period by two concurrent circumstances, offered here as background concerning Plaintiff's overall financial condition: (a) Beginning March 27, 2023, Vivint Solar issued a cease-and-desist notice to Plaintiff based on pending criminal charges that appeared on a background check. Both charges were subsequently resolved in Plaintiff's favor. (b) Plaintiff's driver's license was suspended by the FSD during the relevant period for failure to satisfy child support arrears. In February 2025, Bath Fitter (Martin Martin Renovations, Inc.) extended a conditional employment offer contingent on a valid driver's license; the offer was withdrawn when the background check revealed the suspension. Plaintiff does not allege that either employment loss was caused by the September 16, 2024 incarceration described below; they are offered solely as context for Plaintiff's financial circumstances during the relevant period.

**II. The Enforcement Structure and the Ability-to-Pay Standard**

17. Both child support cases were enforced through the Clark County District Attorney's Office, Family Support Division, which appears in contempt proceedings before a Hearing Master of the Eighth Judicial District Court. Both cases were heard on the same dates, by the same Hearing Master (Jon Norheim), with FSD Deputy District Attorneys appearing for the State. On October 9, 2023, Hearing Master Norheim explicitly stated: 'These are open hearings. I wanted you to be able to hear each other's hearings in case things don't, I don't want to necessarily have to repeat some information.' Both petitioners and the FSD were simultaneously present for each other's cases by the Hearing Master's deliberate design.

18. The constitutional principles relevant to incarceration for nonpayment are reflected in Bearden v. Georgia, 461 U.S. 660 (1983), and Turner v. Rogers, 564 U.S. 431 (2011). Bearden, in the probation-revocation context, requires inquiry into the reasons for nonpayment before imprisonment is imposed for failure to pay a court-ordered financial obligation, including whether the failure to pay was willful or resulted from an inability to

pay despite bona fide efforts to do so. Turner, in the child-support civil-contempt circumstances before it, identified procedural safeguards including notice that ability to pay is the critical issue, a mechanism for obtaining financial information, an opportunity to respond, and an express finding concerning ability to pay. A civil contemnor is confined only for so long as he fails to comply with the condition set for his release, and 'carries the keys of his prison in his own pocket.' Hicks v. Feiock, 485 U.S. 624, 633 (1988). Neither Turner, Bearden, nor Hicks expressly addresses a case in which confinement follows the activation of a previously stayed civil-contempt sentence rather than a newly imposed one. Plaintiff alleges that where a court activates civil-contempt confinement and contemporaneously sets a monetary condition for the contemnor's immediate release, due process requires constitutionally adequate consideration of the contemnor's present ability to satisfy that condition, regardless of the procedural vehicle used to hold the contemnor until it is satisfied. Separately, 45 C.F.R. § 303.6(c)(4) requires that a state Title IV-D agency's civil contempt guidelines include procedures to (i) screen a case for the obligor's ability to pay or otherwise comply, (ii) provide the court with information regarding the obligor's ability to pay or otherwise comply, and (iii) provide the obligor with clear notice that ability to pay is a critical issue in the contempt proceeding. Plaintiff does not assert 45 C.F.R. § 303.6(c)(4) as an independent, privately enforceable cause of action; Plaintiff alleges these requirements as relevant to the procedural safeguards that inform the constitutional adequacy of the process Plaintiff received.

19. Plaintiff's claim is procedural in nature. Plaintiff does not contend that any particular custody outcome was substantively compelled to go the other way, that Plaintiff was entitled to any specific ruling, or that no discussion of Plaintiff's financial circumstances occurred. The September 16, 2024 hearing included discussion of Plaintiff's income, housing, and earning capacity. Plaintiff alleges that although the hearing included that discussion, the record does not identify a determination tied to Plaintiff's present ability to satisfy the specific release condition imposed that day, and that the FSD's presentation to the court consisted of historical payment-compliance information rather than present-ability information addressed to that release condition.

20. Plaintiff's financial circumstances during the relevant period included the following documented conditions, which were presented to the court in filings and testimony: (a) 2022 federal income tax return showing adjusted gross income of $12,462 and taxable income of $0, filed with the court on August 28, 2023; (b) year-to-date earnings for 2023 of $8,923.75 as of the August 28, 2023 filing, representing the only closed commission received that year; (c) active enrollment in the federal Supplemental Nutrition Assistance Program (SNAP), with a gross income of $0 as reflected on the SNAP award letter; (d) an active Offer in Compromise with the Internal Revenue Service reflecting tax debt exceeding $300,000; (e) active charitable assistance from Plaintiff's church congregation and Hopelink of Southern Nevada for basic living expenses including rent, utilities, and food — assistance provided directly to landlords and utility companies, not as cash transfers to Plaintiff; (f) a Bank of America account balance of $0.48 on January 17, 2024; and (g) a court-granted Order to Proceed In Forma Pauperis entered September 5, 2023 in Case No. 98R092097, constituting a contemporaneous judicial finding that Plaintiff was unable to pay court filing fees.

**III. Chronological Record — Notice, Pattern, and the September 16, 2024 Injury**

21. Plaintiff describes the hearings below in chronological order. Only the September 16, 2024 hearing is alleged as an independent, timely constitutional injury supporting damages. The remaining hearings are offered as historical and pattern evidence bearing on the persistent-practice theory described in Count II below. Consistent with the distinction drawn in the Introduction above, statements by the presiding Hearing Master are offered as evidence of what information was before the court, not as evidence of County policy, and statements by FSD attorneys in court are offered as evidence of the FSD's recurring practice, not as a basis for individual liability against the attorneys who made them.

22. September 1, 2022 — First Contempt Hearing (Pattern/Notice Evidence). At the initial contempt hearing, Plaintiff was represented by counsel (Kyle A. King, Esq.). Plaintiff's counsel disclosed to the court that Plaintiff had earned negative income — having taken advances against commissions that subsequently failed to close — and that Plaintiff's rent was being paid by his church congregation. The court found contempt and sentenced

Plaintiff to five days, stayed, contingent on resuming payments. Both cases were addressed in the same hearing.

23. December 19, 2022 — Continued Contempt (Pattern/Notice Evidence). No child support payments had been made between the September 1 hearing and December 19, 2022. Plaintiff's counsel represented that Plaintiff had earned approximately negative income due to commission advances against deals that did not close, and that his church was paying his rent. The court imposed ten days jail, stayed to three days, with a release amount of $150 per case ($300 total).

24. March 21, 2023 — Absent Hearing; One-Sided Testimony (Pattern/Notice Evidence). Plaintiff failed to appear at the March 21, 2023 hearing. The FSD petitioner in Case No. R-22-221265-R testified extensively about Plaintiff's lifestyle without Plaintiff present to respond. No ability-to-pay inquiry was conducted in Plaintiff's absence. No-bail bench warrants were issued in both cases. Purge amounts: $1,165 (Kaiser case) and $256.84 (Dreibelbis case).

25. May 4, 2023 — In-Custody Bail Hearing (Pattern/Notice Evidence). Plaintiff appeared in custody. When Plaintiff testified that he had $20 in accessible funds, the Hearing Master set the release amount at $10 per case — $20 total — the exact amount Plaintiff had stated he possessed.

26. October 9, 2023 — CE Seizure Presented (Pattern/Notice Evidence). Plaintiff appeared and presented documentary evidence of Commission Express's seizure of his commissions, including email documentation from the broker confirming payment had been sent to Commission Express. Hearing Master Norheim acknowledged: 'So you believe there was a seizure? There was a seizure, yeah.' Despite this acknowledgment, the court imposed five days jail with a release amount of $150. Plaintiff's documented bank balance at the time of this hearing was $27.10, declining to $16.16 shortly thereafter.

27. October 24, 2023 — Modification Hearing; Documented Hardship Finding (Pattern Evidence). This hearing is significant pattern evidence for the persistent-practice theory in Count II below. The FSD Deputy District Attorney stated on the record: 'I don't believe that he is able to afford this child support obligation. I did verify that he is being evicted.

He's got problems that are real.' Hearing Master Norheim made a formal finding: 'I put on the record and I made a finding that for your economic situation, your problems are in fact real.' Child support in Case No. R-22-221265-R was reduced to $629 per month on a temporary basis. No remand was ordered. The hardship finding made at this hearing was never vacated.

28. January 30, 2024 (Pattern/Notice Evidence — Not Independently Pled). Ninety-seven days after the October 24, 2023 hardship finding, a different FSD Deputy District Attorney stated: 'In my opinion, he does not look indigent. So I think he has some ability to pay. I'll leave it to the court's discretion.' That assessment was based on visual observation of Plaintiff's appearance, without renewed documentary inquiry into Plaintiff's accessible liquid resources. Child support was simultaneously reduced to $132 per month based on Plaintiff's financial disclosure showing income at or near zero. The court ordered a three-day remand with a release amount of $75 per case ($150 total). Plaintiff's Bank of America account balance thirteen days before this hearing was $0.48. Plaintiff alleges this hearing as evidence that the recurring FSD practice described in Count II continued after the October 24, 2023 hearing described in Paragraph 27 above. Plaintiff does not seek damages for the January 30, 2024 incarceration as an independent claim.

29. June 5, 2024 (Pattern/Notice Evidence — Not Independently Pled). Deputy District Attorney Sara Kopjo appeared for the FSD. The official case summary journal entry records that DDA Kopjo 'indicated she finds Respondent's testimony credible' regarding his financial circumstances, including his lack of an automobile, his residence in a barn on his daughter's property, and the Commission Express seizures. Despite this credibility finding, DDA Kopjo 'requested a payment today to avoid remand.' The court imposed five days with a release amount of $109. Plaintiff alleges this hearing as further evidence of the recurring practice described in Count II. Plaintiff does not seek damages for the June 5, 2024 incarceration as an independent claim.

30. September 16, 2024 — The Constitutional Injury Giving Rise to This Action. At this hearing, Plaintiff testified that Commission Express had diverted more than $30,000 in commissions from two brokerages before those funds became accessible to him, and produced documentation concerning the withheld commissions, including payment records

showing Commission Express receiving commission proceeds. Hearing Master Norheim acknowledged: 'You make a very compelling argument that they're an unsecured creditor and that they're acting as a secured creditor and they shouldn't be allowed to do that.' The hearing included discussion of Plaintiff's housing, food assistance, transportation, and earning capacity. The FSD's evidence at this hearing, on information and belief prepared in advance of the hearing by Doe 3, consisted of a historical payment-compliance calculation — approximately $327.00 due, $128.00 paid, 39% compliant — which addressed whether Plaintiff had complied with the ongoing support obligation. During the hearing, Plaintiff testified: 'There's no way I can come up with any money. There is absolutely no way.' The hearing thereafter included further discussion of Plaintiff's employment prospects, earning capacity, housing, transportation, commissions, and financial circumstances. The FSD ultimately requested one month's support in each case as the purge amount. The court then found Plaintiff in contempt and set the release condition by stating: 'I am going to set you just one month, which is what the state requested. So that's 109 in the Kaiser case and… 256,' and then confirmed: 'But 365 will get you out today.' The court remanded Plaintiff into custody that day; immediate release required payment of the combined $365 — $109 in the Kaiser case and $256 in the companion case, Case No. 98R092097 — not the $109 Kaiser figure alone. The written Master's Recommendation entered in each case that day states, in identical language: 'Respondent has 2 open cases being enforced through DAFS. The total monthly payment for both cases is $365,' showing that the combined $365 release condition matched the court's stated total monthly payment for the two cases. The written recommendations further found that, during the preceding review period, Plaintiff had the ability to pay support but failed to do so, and characterized that nonpayment as willful and not the result of indigency or inability to pay. Plaintiff does not challenge those retrospective findings in this action. Plaintiff alleges that neither recommendation separately identified evidence that he presently possessed or could presently obtain the combined $365 required to secure his immediate release on September 16, 2024. The identical Master's Recommendations likewise characterized Plaintiff's general circumstances by stating that he 'does not appear to be indigent,' but did not tie that general conclusion to a finding that Plaintiff presently could obtain the specific $365 required for release. In each case, the court imposed a new

15-day sentence for the September 16, 2024 contempt finding, and stayed that entire new sentence pending future compliance; separately, in the Kaiser case, the court activated 5 days from a previously stayed 27-day contempt sentence imposed January 9, 2023 (leaving 22 days of that sentence stayed), and in the companion case, Case No. 98R092097, the court activated 5 days from a different previously stayed 42-day contempt sentence imposed October 9, 2023 (leaving 37 days of that sentence stayed); it was the activated days from these earlier sentences, not the newly imposed and fully stayed September 16, 2024 sentences, that Plaintiff actually served. Both written orders state that Plaintiff was to be released from custody on September 21, 2024, or immediately upon payment of the applicable release amount; the earlier-obtained docket entry's reference to a release date of "09/03/2024" predates the hearing itself and is superseded by the written orders' consistent September 21, 2024 date. This sequence — a new sentence imposed and fully stayed while a portion of an earlier stayed sentence is activated — is the same mechanism reflected in the hearings described in Paragraphs 28 and 29 above. Each written order further states that before any additional jail time is imposed, the court will hold another hearing, 'pursuant to Turner v. Rogers, 564 U.S. 431 (2011), to determine ability to pay, and a jail release amount will be set that is within the Respondent's ability to pay at that time' — reflecting institutional awareness of the Turner standard for future release amounts, in contrast to the absence of a comparable present-ability finding for the $365 release condition imposed that same day. No express finding, oral or written, connected the combined $365 release condition to any specific evidence of Plaintiff's present ability to access that amount. Plaintiff's adult son was discussed as a possible practical means of making the current release payment only after the ruling; his ability or willingness to provide funds was not evidence relied upon in setting the $365 release condition. Plaintiff was incarcerated for five days as a result of the activation of the previously stayed sentences described above. At the time of this hearing, Plaintiff was living in a converted barn on his adult daughter's property, subsisting on SNAP benefits, with no vehicle, and had testified that he had no money available to make the required payment.

31. December 10, 2024 — Contrast Event (Pattern Evidence). Judicial Officer Merle K. Lok presided over the Kaiser case, with Deputy District Attorney Gerard Costantian appearing for the FSD. Plaintiff presented circumstances similar to those presented at the hearings

described above. Judicial Officer Lok stated: 'Once you get a job, I want the DA to be able to send a garnishment for which it will be honored.' Judicial Officer Lok granted a continuance, ordered work search, and imposed no custody. This outcome — no incarceration under materially similar financial circumstances — supports Plaintiff's allegation that incarceration was not an inevitable outcome but a function of how the FSD's administrative practice was applied at a given hearing.

**IV. The Recurring FSD Administrative Practice**

32. Plaintiff alleges that the recurring practice giving rise to Clark County's liability is administrative in character: the FSD's repeated practice, performed before and apart from any in-hearing advocacy, of (a) compiling and approving historical payment-compliance information — such as the $327.00 due / $128.00 paid / 39% compliance figures used at the September 16, 2024 hearing — for transmission to the court without identified purge-specific present-ability information tied to the release condition imposed that day, (b) performing or failing to perform individualized present-ability screening, and (c), where such work occurred administratively, generating or approving a recommended purge figure corresponding to a standardized period of support, such as 'one month,' rather than an amount tied to a documented assessment of the obligor's present accessible resources. The FSD attorney's in-court presentation of that information and request for that figure, and the statements of Hearing Master Norheim quoted in Paragraphs 22 through 31 above, are offered as evidence of the output of that administrative process and of what information was placed before the court at each hearing; neither is itself alleged to constitute the Clark County policy or custom, which is the administrative practice described above.

33. Although several of the hearings preceding September 16, 2024 at which custody was imposed included discussion of Plaintiff's financial circumstances and earning capacity, the presently available record does not identify a determination, at any of them, tied to Plaintiff's present ability to satisfy the specific release condition imposed that day. The October 24, 2023 hearing — at which the most substantial documented inquiry among these hearings was conducted — produced no custody order.

34. Plaintiff is presently without information regarding the specific FSD training materials, contempt guidance, purge-setting policies, supervision structures, or enforcement protocols that governed the FSD's ability-to-pay methodology during the relevant period, including whether any present-ability screening called for by Nevada's Support Enforcement Manual § 612 or 45 C.F.R. § 303.6(c)(4) was performed before the September 16, 2024 hearing, and whether the $109 and $256 figures comprising the combined $365 release condition resulted from an individualized calculation, a standardized "one month of support" methodology, or some other process. These institutional facts are uniquely within Defendants' possession and will be developed through the early discovery described in Paragraph 8 above. The presently available record does not identify an adequate individualized present-ability screening performed before the September 16, 2024 hearing.

## LEGAL CLAIMS

### COUNT I

Violation of the Fourteenth Amendment — Due Process
(42 U.S.C. § 1983 — Individual Capacity Claims Against Does 1 Through 3)

35. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

36. The Fourteenth Amendment prohibits any state from depriving a person of liberty without due process of law. As set forth in Paragraph 18 above, Bearden and Turner require, among other safeguards, a meaningful inquiry into willfulness versus genuine inability to pay and an express finding concerning the obligor's ability to pay before incarceration is imposed for nonpayment of a civil obligation. Plaintiff alleges, for the reasons stated in Paragraph 18 above, that due process requires constitutionally adequate consideration of present ability to satisfy the monetary release condition where civil-contempt confinement is activated and a purge is contemporaneously imposed, whether the confinement is characterized as a newly imposed sentence or execution of a previously stayed sentence. Incarceration imposed for failure to satisfy a civil purge amount, without an adequate individualized inquiry into the obligor's present ability to pay that specific amount, constitutes an unconstitutional deprivation of liberty.

37. On information and belief, Doe 1 was responsible for performing or ensuring any pre-hearing present-ability screening applicable to the September 16, 2024 hearing. The presently available record does not disclose whether such screening was performed, and if performed, what it found. Plaintiff alleges that whatever screening, if any, was performed did not result in the FSD's presenting identified purge-specific present-ability information tied to Plaintiff's ability to access the $365 release amount, as distinguished from the historical compliance information and generalized information concerning Plaintiff's financial circumstances described in Paragraph 30 above.

38. On information and belief, to the extent the $109 and $256 figures comprising the combined $365 release condition were calculated, entered, or approved through pre-hearing administrative work, Doe 2 participated in that work. The presently available record does not disclose whether those figures resulted from an individualized present-ability calculation, a standardized "one month" methodology, or some other process. Plaintiff alleges that the combined $365 figure ultimately requested by the FSD and adopted by the court as the condition of Plaintiff's release from the September 16, 2024 remand was not supported, at the hearing, by identified evidence establishing Plaintiff's present ability to access that amount.

39. On information and belief, Doe 3 prepared or approved the financial and compliance information presented to the court at the September 16, 2024 hearing — the $327.00 due / $128.00 paid / 39% compliance figures described in Paragraph 30 above — which addressed historical payment compliance rather than present ability to pay. The pre-hearing financial/compliance information supplied by the FSD did not itself include or account for the documented Commission Express diversions or Plaintiff's homelessness, although both subjects were separately raised through Plaintiff's testimony at the hearing and were independently known to the FSD by that date through Plaintiff's testimony at prior hearings.

40. The conduct of Does 1 through 3 described above was administrative and investigative in character, performed before and apart from any in-hearing advocacy, and is distinguishable on that basis from the conduct of the FSD attorney who appeared in court at the September

16, 2024 hearing. Buckley v. Fitzsimmons, 509 U.S. 259 (1993) (investigative and administrative functions are not entitled to absolute prosecutorial immunity).

41. The pre-hearing administrative work described above was transmitted into and used in the FSD's presentation at the September 16, 2024 hearing. In imposing the purge condition, the Hearing Master expressly stated that he was setting 'just one month, which is what the state requested.' Plaintiff alleges that the FSD's requested purge amount and financial presentation — themselves the product of the pre-hearing administrative conduct of Does 1 through 3 — were material inputs into the custody order that resulted. Plaintiff does not seek damages against the FSD attorney who made the in-court request, and does not predicate liability upon the Hearing Master's judicial act of imposing the sentence; Plaintiff alleges that the pre-hearing conduct supplying the information and figure the court adopted was a proximate cause of Plaintiff's incarceration.

42. The written journal entry's characterization of the September 16, 2024 five-day sentence as stayed, and of the days actually served as execution of a previously stayed contempt sentence, does not alter this claim. The FSD requested, and the court adopted as the combined $365 release condition, the $109 and $256 figures described in Paragraph 30 above; Plaintiff was remanded and held that day because he could not pay that amount. Civil contempt confinement is defined by the ability of the contemnor to secure release by complying with the condition set for release — he 'carries the keys of his prison in his own pocket.' Hicks v. Feiock, 485 U.S. 624, 633 (1988). Plaintiff does not ask this Court to vacate any prior contempt finding or support order, and does not contend that the January 9, 2023 sentence was itself improperly imposed. Plaintiff challenges only the adequacy of the process that produced the September 16, 2024 remand and the $365 release condition on which his liberty depended that day. As set forth in Paragraph 30 above, the five days Plaintiff actually served were the activation of previously stayed sentences from January 9, 2023 and October 9, 2023, respectively; the newly imposed September 16, 2024 sentences were themselves stayed in full.

43. As a direct and proximate result of the constitutionally deficient pre-hearing conduct described above, Plaintiff suffered a deprivation of liberty through incarceration and related harms described below.

**COUNT II**

Monell Municipal Liability — Persistent Practice and Custom

(42 U.S.C. § 1983 — Against Defendant Clark County)

44. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

45. A municipality may be held liable under 42 U.S.C. § 1983 where a plaintiff demonstrates that a constitutional deprivation was caused by a custom, practice, or policy of the municipality. Monell v. Department of Social Services, 436 U.S. 658 (1978). A persistent practice may establish municipal liability even in the absence of a formal written policy where the practice is widespread enough to constitute a custom with the force of law. Id.

46. Plaintiff alleges that the FSD's administrative arm maintained a persistent practice and custom, described in Paragraph 32 above, of supplying historical payment-compliance information without identified purge-specific present-ability information and, where purge recommendations were generated administratively, generating or approving standardized purge recommendations that were subsequently presented or requested in court by FSD counsel, in proceedings where incarceration was recommended and imposed. This custom is the conduct of FSD administrative personnel described in Count I, not the judicial acts of the Hearing Master or the in-court advocacy of FSD attorneys, which are offered only as evidence of the pattern's existence and duration.

47. The recurring outputs of the alleged administrative practice are reflected across the hearings described in Paragraphs 22 through 31 above, spanning September 2022 through December 2024, and culminated in the constitutionally deficient September 16, 2024 proceeding described in Paragraph 30. The October 24, 2023 hearing, at which the most substantial documented inquiry was conducted, produced no custody order, and no documented adjustment to the FSD's administrative practice followed it; the same absence of a present-ability determination tied to the specific release condition recurred at the January 30, 2024 and June 5, 2024 hearings described in Paragraphs 28 and 29 above before culminating in the September 16, 2024 hearing. The December 10, 2024 hearing, at which no custody was imposed under materially similar circumstances, further supports

the inference that the recurring custody outcomes were a function of the FSD's administrative practice, not an inevitable result of the underlying facts.

48. Plaintiff is presently without information establishing the specific Clark County officials or bodies responsible for supervising or setting policy for the FSD's present-ability screening and purge-calculation practices, or the extent to which those specific administrative functions are attributable to Clark County as opposed to the State of Nevada's Title IV-D program. Plaintiff alleges, on information and belief, that Clark County exercised supervisory and administrative control over the FSD personnel who performed the conduct described in Count I, and that this control is attributable to Clark County as a matter of Nevada law and the operative Title IV-D cooperative agreement between Clark County and the State. Plaintiff reserves the right to amend this allegation, including to name any additional or different defendant properly revealed through discovery, as this division of responsibility is clarified.

49. The persistent practice alleged was the moving force behind the September 16, 2024 constitutional deprivation, including the deprivation of liberty through incarceration and related harms described below.

**DAMAGES**

50. As a direct and proximate result of the September 16, 2024 constitutional deprivation described above, Plaintiff has suffered the following categories of harm:

(a) Deprivation of liberty through five days of incarceration beginning September 16, 2024, after Plaintiff was remanded that day and held unless he paid the combined $365 release condition requested by the FSD and set that day across the two simultaneously heard cases — $109 in Case No. R-22-221265-R and $256 in the companion case;

(b) Lost commission earning opportunities specifically attributable to the September 16, 2024 custody period, to the extent established through discovery, including real estate transactions requiring active management and client communication that could not be conducted while Plaintiff was incarcerated;

(c) Emotional distress arising from the September 16, 2024 incarceration and the circumstances surrounding it;

(d) Such other and further compensatory damages, if any, as may be established through discovery and proven at trial.

51. Plaintiff is entitled to compensatory damages and nominal damages, and — to the extent any individual Defendant's conduct is found to have been taken with reckless disregard for Plaintiff's federally protected rights — punitive damages as permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mark V. Dreibelbis respectfully requests that this Court:

1. Enter judgment in Plaintiff's favor on all counts;

2. Award compensatory damages in an amount to be proven at trial for deprivation of liberty and any other damages established through discovery;

3. Award nominal damages for constitutional violations where compensatory damages are not established;

4. Award punitive damages against the individual Defendants to the extent warranted by the evidence at trial;

5. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988 if and when Plaintiff is represented by counsel;

6. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: 9-15, 2026

Respectfully submitted,

MARK V. DREIBELBIS

Plaintiff in Pro Per

1500 Misty Sky Drive

Henderson, Nevada 89052

(702) 449-2181

Mark@lvreonline.com